UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHNATHAN LEE BLAND #893926,

    Plaintiff,

v.

DREW WAGNER and
DANNY POOLEY,

    Defendants.
_____/

Hon. Janet T. Neff

Case No. 1:19-cv-297

# REPORT AND RECOMMENDATION

    Plaintiff, Johnathan Bland, has sued Defendants Drew Wagner and Danny Pooley—police officers employed by the City of Benton Harbor—alleging that they violated his rights under the Fourth Amendment by use of excessive force in effecting an arrest of Plaintiff. The matter is before the Court on Defendants' Motion for Summary Judgment. (ECF No. 35.) Pursuant to 28 U.S.C. § 636(b)(1)(B), I recommend that Defendants' motion be **GRANTED**.[1]

## I. Facts

    On October 16, 2018, Benton Harbor Police dispatch received a call from an individual at 114 N. McCord stating that Plaintiff was inside the residence. At the time, Plaintiff had two outstanding warrants for his arrest relating to an incident that had occurred on September 5, 2018. Sgt. Takemoto and Defendants Wagner and Pooley responded to the scene. While preparing to leave the station, the officers received another report that Plaintiff was assaulting an individual at the same address. (ECF No. 36-1 at PageID.111.)

---

[1] Although Defendants have requested oral argument, the Court finds that oral argument is unnecessary as the briefing has adequately developed the issues.

When the officers arrived at 114 N. McCord, around 7:11 a.m., they spread out around the house to prevent an escape. Defendant Wagner went to the backyard of the house (on the west side), Defendant Pooley watched from the northeast corner and Sgt. Takemoto went to the front door. As Sgt. Takemoto approached the house, a female could be heard inside yelling loudly. (*Id.* at PageID.115.) Sgt. Takemoto knocked on the door. Plaintiff's and Defendants' versions of the events that followed differs significantly.

A.   **Plaintiff's Version**

The following facts are taken from Plaintiff's affidavit filed in support of his amended complaint. Plaintiff heard a knock on the door and, believing that it was some guests who had recently left and returned, answered it and immediately saw a gun pointed at his face. Unable to determine who was holding the gun and panicking, Plaintiff ran to the back of the house and dove through a closed bedroom window. (ECF No. 9-1 at PageID.31.) Plaintiff claims that that he did not know who was pursuing him, so he got up and ran, even though he heard someone yell "stop[,] police." Once Plaintiff reached a brightly lit area, he turned and saw that a police officer was in fact chasing him, so he stopped and put his hands on his head. Defendant Wagner then approached Plaintiff with his taser drawn and deployed it in Plaintiff's chest, causing Plaintiff to hit a car and fall to the ground. Defendant Wagner jumped on Plaintiff and hit Plaintiff in the nose with a closed fist, causing Plaintiff to black out for a few seconds. Plaintiff tried to use his hands to protect his face, but he was struck in the left eye with a blunt object. Defendant Wagner then kneed Plaintiff in the face as he was trying to get up from underneath Defendant Wagner. Plaintiff tried to get off the ground again, but Defendant Pooley, who had arrived on the scene, elbowed Plaintiff in the stomach before placing a handcuff on Plaintiff's left wrist. (*Id.*) Defendant Pooley then used his taser on Plaintiff, and Plaintiff fell back to the ground face first. Defendants kneed and kicked Plaintiff again but Plaintiff caught Defendant Wagner's foot before he could kick Plaintiff.

2

Defendant Pooley then tased Plaintiff a third time and Plaintiff rolled over on his back, yelling, "I give up, I give up, ya'll tryin to kill me." (*Id.* at PageID.32.) Plaintiff claims that, while Defendant Pooley held Plaintiff's left arm, Defendant Wagner elbowed Plaintiff in the mouth three times, knocking out a few of Plaintiff's front teeth and loosening others. (*Id.*)

Defense counsel deposed Plaintiff. In his deposition, Plaintiff affirmed the accuracy of the facts set forth in his affidavit. (ECF No. 36-3 at PageID.144.) Plaintiff denied using illegal drugs prior to the incident. (*Id.* at PageID.152.) Plaintiff also said that he did not ask the police officers to kill him. (*Id.* at PageID.156.) Plaintiff denied continuing to resist after the officers told him to stop resisting the arrest and denied hitting Defendant Wagner in the face. (*Id.* at PageID.157.) Plaintiff also said that Defendant "Pooley really did nothing that was force," but he felt that Pooley should have intervened to stop Defendant Wagner's use of excessive force. (*Id.* at PageID.162.)

### B. Defendants' Version

According to the police report, Sgt. Takemoto knocked on the front door and Ashley Allen (who made the calls to police dispatch) answered the door for Sgt. Takemoto to come inside. Allen then said, "there he is," referring to Plaintiff. (ECF No. 36-1 at PageID.115.) Almost immediately, Plaintiff ran to the back of the house and dove head first through a closed window. (*Id.*) Defendant Wagner heard Sgt. Takemoto yell "Window!" and saw Plaintiff dive head first through the glass and into the back yard. (*Id.* at PageID.112.) Defendant Wagner ran toward Plaintiff yelling "Police!" and "Stop!" but Plaintiff got on his feet and ran. Defendant Wagner chased Plaintiff though an alley and then east on Benton. Defendant Wagner was approximately 20 feet behind Plaintiff with his taser in his hand when Plaintiff tripped and fell in the road on Benton.

Plaintiff got back on his feet and squared his body toward Defendant Wagner in an aggressive fighting/boxer's stance with his fists up and yelling at Defendant Wagner. Plaintiff swung a right-handed closed fist punch at Defendant Wagner and hit him in the left jaw and neck

3

area, and Defendant Wagner swung back, hitting Plaintiff in the nose area. Defendant Wagner then deployed his taser at Plaintiff while he was squared up, striking him in the chest with both probes. At that point Plaintiff became angrier and hit Defendant Wagner on the left side of his face with a closed fist punch. Plaintiff tried running away but fell to the ground on a vacant lot near another alley west of Benton. Defendant Wagner continued to yell "stop" several times and "over here" to alert the other officers to his location. Plaintiff stood back up in a fighting stance and yelled "You're gonna have to fuckin kill me bitch!" As Plaintiff stood up, Defendant Pooley ran toward Defendant Wagner and Plaintiff and deployed his taser at Plaintiff's back, but the taser had no effect on Plaintiff. Plaintiff began to run away, and Defendants Wagner and Pooley tackled him and attempted to apply handcuffs. Plaintiff punched and kicked Defendants in the chest and rib areas. Plaintiff then grabbed Defendant Pooley's arm as Plaintiff tried to get off the ground and Defendants continued to struggle to handcuff him. Defendant Wagner attempted to "drive stun" Plaintiff with his taser but it did not subdue him. Defendant Wagner then struck Plaintiff in the face three times with his right elbow as Plaintiff continued to resist and attempt to get on his feet, knocking some of Plaintiff's teeth out. Plaintiff yelled "You knocked my fucking teeth out!" Defendant Pooley put one handcuff on Plaintiff's left wrist but could not get the other one on Plaintiff's right wrist. Eventually, Deputy Haskins of the Berrien County Sheriff's Department arrived, and the three officers were able to flip Plaintiff over and handcuff him. (ECF No. 36-1 at PageID.112–13.)

      C.    **The Bodycam Video**

At the time Defendants and Sgt. Takemoto arrived at 114 McCord, Defendant Pooley and Sgt. Takemoto were wearing functioning body cameras, or "bodycams." Defendant Wagner was not wearing his bodycam because he had used it on a call earlier in the day and it was still on a charging dock at the station. (*Id.* at PageID.112.) However, Defendants have submitted the footage

from Defendant Pooley's and Sgt. Takemoto's bodycams. The footage from Defendant Pooley's bodycam is the most pertinent to the instant motion.

Both bodycams show Sgt. Takemoto walking up to and knocking on the door. Another person—not Plaintiff—answers the door and steps outside to let Sgt. Takemoto into the house. Almost immediately, Sgt. Takemoto yells that Plaintiff ran to the back of the house and went out the back window. Defendant Pooley responds by running down an alley next to the house as two figures—Defendant Wagner and Plaintiff—can be seen running ahead of him. Defendant Pooley loses sight of Defendant Wagner and Plaintiff. Defendant Pooley runs a bit and then turns right onto another alley. As Defendant Pooley continues running, Defendant Wagner can be heard yelling in the distance, apparently to let the others know his location. Defendant Pooley reaches a street (Benton) and turns right, and a taser can be heard in the distance. Defendant Pooley runs toward the sound of the taser, and Defendant Wagner and Plaintiff appear ahead of him moving from left to right across the street. As Defendant Pooley approaches, Plaintiff falls down and Defendant Pooley deploys his taser in Plaintiff's back, with no effect on Plaintiff. Plaintiff then attempts to get up, and both officers order Plaintiff to get down and turn around to be handcuffed. Plaintiff fails to comply and repeatedly states, "I'm going to die, I'm going to die tonight." As Defendants continue to struggle with Plaintiff, Plaintiff states, "Ya'll going to have to kill me tonight." A few seconds later one of the officers uses his taser again, but it has no effect on Plaintiff. Plaintiff then states "can ya'll shoot me?" as he continues to struggle with Defendants and refuses their commands to "turn around" to be cuffed. Seconds later, Plaintiff yells that Defendant Wagner just knocked his teeth out and pleads, "kill me, kill me." Defendant Wagner tells Plaintiff to stop resisting and stop fighting but Plaintiff continues to state, "You're going to have to kill me." After a minute or so, Sgt. Takemoto and another officer arrive and the officers are then able to roll

5

Plaintiff over on his stomach and handcuff him behind his back. As the situation calms down and the officers respond to Plaintiff's request to let him "breathe," Plaintiff asks to see the officer with the "strong punch." Defendant Wagner responds, "you punched me first." Plaintiff then commends Defendant Wagner, stating, "One hell of a job, bitch." Plaintiff then states, "I didn't mean no harm, really."

## II. Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## III. Discussion

Defendants argue that they are entitled to summary judgment on the ground of qualified immunity.[2] "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable

---

[2] Since filing his complaint, Plaintiff has conceded that Defendant Pooley did not use force that can be considered excessive. Plaintiff contends, however, that Defendant Pooley should have intervened in Defendant Wagner's use of force. (ECF No. 36-3 at PageID.162.) Because the Court concludes that Defendant Wagner did not use excessive force on Plaintiff, it need not separately analyze Plaintiff's claim that Defendant Pooley failed to intervene.

6

person would have known.'" *Phillips v. Roane Cty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once a defendant raises the qualified immunity defense, the burden shifts to the plaintiff to demonstrate that the defendant officer violated a right so clearly established "that every 'reasonable official would have understood that what he [was] doing violate[d] that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The analysis entails a two-step inquiry. *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013). First, the court must "determine if the facts alleged make out a violation of a constitutional right." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (1982)). Second, the court asks if the right at issue was "'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it." *Id.* (citing *Pearson*, 555 U.S. at 232). A court may address these steps in any order. *Id.* (citing *Pearson*, 555 U.S. at 236). A government official is entitled to qualified immunity if either step of the analysis is not satisfied. *See Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016).

In applying the first step of the qualified immunity analysis, a court must identify "the specific constitutional right allegedly infringed" and determine whether a violation occurred. *Graham v. Connor*, 490 U.S. 386, 394 (1989). The court considers the state of the law at the second step. As the Supreme Court has observed, "this Court's case law does not require a case directly on point for a right to be clearly established, [but] existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, ––U.S.––, 137 S. Ct. 548, 551 (2017) (internal quotation marks and original brackets omitted) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). "'[C]learly established law' may not be defined at such 'a high level of generality.'" *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 992 (6th Cir. 2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). "[A] plaintiff must identify a case with a similar fact pattern

7

that would have given 'fair and clear warning to officers' about what the law requires." *Id.* (quoting *White*, 137 S. Ct. at 552). Stated differently, "[o]n both the facts and the law, specificity is [a court's] guiding light." *Novak v. City of Parma*, 932 F.3d 421, 426 (6th Cir. 2019).

The Court will address both steps of the qualified immunity analysis, considering first whether the evidence in the record establishes a constitutional violation. Plaintiff claims that Defendants violated his Fourth Amendment rights by their use of excessive force in arresting him.

An excessive force claim must be analyzed under the Fourth Amendment's standard of objective reasonableness. *Graham v. Connor*, 490 U.S. 386, 395–96 (1989). This standard must be applied in light of the reality that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Id.* at 397. Thus, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. In determining whether an officer's actions were reasonable, the court must examine the specific facts of the case. *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (2001). Factors that bear on the issue are: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the suspect is cooperating or is actively resisting arrest or attempting to flee. *Id.* The test is "fact specific, not mechanical[.]"

Regarding the first factor, Defendants were attempting to arrest Plaintiff on outstanding warrants for home invasion and malicious destruction of property. Home invasion is a felony under Michigan law, punishable by up to 20 years in prison. Mich. Comp. Laws § 750.11a. Malicious destruction of property may be either a felony or a misdemeanor, depending on the circumstances. Mich. Comp. Laws § 750.377a. Although these are serious crimes, Plaintiff was not engaged in

them at the time. However, Defendants had received information that Plaintiff had been assaulting someone inside 114 N. McCord, and Plaintiff immediately fled the scene when the officers arrived.

The second factor is neutral, as Plaintiff immediately fled the scene and thus was not posing an immediate danger to the officers or bystanders.

As for the last factor, it is undisputed that Plaintiff fled the scene, and once apprehended by both Defendants, not only physically resisted even after Defendants had him on the ground, but made it known through his words—"I'm going to die, I'm going to die tonight," and "Ya'll going to have to kill me tonight"—that he was not going to comply with Defendants' commands and that they would need to use force in order to subdue him. Moreover, at the end of the arrest Plaintiff admitted that he assaulted Defendant Wagner by punching him in the face, but explained, "I didn't mean no harm, really."

The question remains whether an issue of fact precludes summary judgment. As noted above, Plaintiff's version is somewhat at odds with Defendants' version set out in the police report. Defendants acknowledge as much, noting that Plaintiff's allegations, "if true, describe a would-be problematic arrest situation." (ECF No. 36 at Page 36.) The bodycam videos, however, may clarify the facts at issue. In *Scott v. Harris*, 550 U.S. 372 (2007), the Supreme Court held that video from the dashboard camera of a police vehicle taken during a high-speed chase created an indisputable factual record for purposes of summary judgment. The Court noted that the plaintiff's version, as adopted by the court of appeals, suggested that the plaintiff, "rather than fleeing from police, was attempting to pass his driving test." *Id.* at 379. On the other hand, the Court said,

> [t]he videotape tells quite a different story. There we see [the plaintiff's] vehicle racing down narrow, two-lane roads in the dead of night at speeds that are shockingly fast. We see it swerve around more than a dozen other cars, cross the double-yellow line, and force cars traveling in both directions to their respective shoulders to avoid being hit. We see it run multiple red lights and travel for considerable periods of time in the occasional center left-turn-only lane, chased by

9

> numerous police cars forced to engage in the same hazardous maneuvers just to keep up. Far from being the cautious and controlled driver the lower court depicts, what we see on the video more closely resembles a Hollywood-style car chase of the most frightening sort, placing police officers and innocent bystanders alike at great risk of serious injury.

*Id.* at 379–80 (footnotes omitted). The Court held that this evidence compelled summary judgment: "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380.

Defendants contend that, as in *Scott*, the video evidence is the game-changer for purposes of summary judgment because it shows, not only that Plaintiff's version is false, but shows Plaintiff fleeing, resisting arrest, and fighting with Defendants and stating that they will have to kill him in order to subdue him. (ECF No. 36 at PageID.97–98.) Plaintiff argues that the video evidence is not conclusive because it is incomplete; there are brief portions where Defendant Wagner and Plaintiff are not shown. (ECF No. 44 at PageID.194.)

Plaintiff is correct that the video does not show everything and, as Defendants note, it "is rough and unclear at times." (ECF No. 36 at PageID.97.) In my judgment, however, *Scott* applies because the video evidence so blatantly contradicts Plaintiff's version "that no reasonable jury could believe it." *Id.* at 380. The video evidence discredits Plaintiff's version from the outset. Where Plaintiff says that *he* opened the door and saw someone pointing a gun at him, Ashley Allen opened the door for Sgt. Takemoto, who was not holding a gun. The video evidence also shows that, contrary to Plaintiff's claim that he did not know who was at the door, Plaintiff fled to the back of the house after seeing Sgt. Takemoto at the door in police uniform. More importantly, the video evidence shows that Plaintiff's claim that he intended to cooperate at any point during the encounter is simply not true. Plaintiff fled and resisted from the beginning to the end. His assertion that he told Defendants "I give up, I give up, ya'll tryin to kill me," is demonstrably false. Instead,

10

Plaintiff told Defendants that they would have to kill him, and he asked them to shoot him. After watching the video and hearing Plaintiff's own words, no reasonable jury could believe Plaintiff's version.

In light of this indisputable evidence of Plaintiff's resistance, the force Defendants used to apprehend Plaintiff was objectively reasonable as a matter of law. In *Goodrich v. Everett*, 193 F. App'x 551 (6th Cir. 2006), the Sixth Circuit held that the defendant officers did not use excessive force on the plaintiff in their attempt to neutralize him—even though they conceded for purposes of summary judgment that the plaintiff was not resisting arrest—by tackling the plaintiff and kneeing and kicking him with such force that they broke his ribs and dislocated his hip. *Id.* The court noted that, similar to the instant case, the plaintiff refused to comply with the officers' commands, evaded roadblocks during the pursuit, walked away from the officers once he parked and exited his vehicle and the officers could have reasonably interpreted his actions, which were, at best, ambiguous, as continued evasion. *Id.* at 555–56. Similarly, in *Schliewe v. Toro*, 138 F. App'x 715 (6th Cir. 2005), the Sixth Circuit held that an officer's punch, which broke the plaintiff's jaw, was reasonable force under the circumstances:

> The amount of force used to subdue Mr. Schliewe was reasonable. While Mr. Schliewe was not charged with a serious crime, it was difficult for the officers to judge his intentions because Mr. Schliewe had behaved erratically during the evening and was apparently intoxicated. Mr. Schliewe was attempting an escape from the holding area of the police station and resisted the officers' attempts to subdue him, thus justifying the use of at least some force. Mr. Schliewe focuses on the blow struck by Officer Toro as unreasonable. While punching someone may not be the best way to prevent his escape, it cannot be said that the blow was objectively unreasonable. The entire incident was over very quickly and the officers had never been confronted with an individual attempting to enter the communications room from the holding area. Officer Toro reacted instinctively to Mr. Schliewe's attempted escape and from the perspective of a reasonable officer on the scene, the blow was not objectively unreasonable.

*Id.* at 722.

Similarly, in the instant case, it cannot be said that Defendants' use of force on Plaintiff, including Defendant Wagner's punches to Plaintiff's face resulting in Plaintiff's loss of teeth, was objectively unreasonable where Plaintiff fought Defendants' attempts to handcuff him and made it clear to the officers that they would have to use force to control him. The same is true of Defendants' use of their tasers on Plaintiff; that was not objectively unreasonable in light of Plaintiff's resistance and statements. *See Caie v. West Bloomfield Twp.*, 485 F. App'x 92, 96–97 (6th Cir. 2012) (holding that the defendant's use of a taser in drive-stun mode was not unreasonable where the plaintiff had consumed a large quantity of drugs and alcohol, his behavior was erratic, he proclaimed a desire to provoke the officers into using deadly force and the plaintiff continued to resist being handcuff after officers took him to the ground). Accordingly, Defendants' use of force did not violate Plaintiff's constitutional rights.

In addition, I recommend that the Court conclude that Defendants are entitled to qualified immunity because a reasonable officer in Defendants' position and confronted with the circumstances presented in this case would not have been on notice that he was violating Plaintiff's clearly established rights. Plaintiff has cited no factually similar case that would have informed Defendants that their conduct was unlawful.

### IV.  Conclusion

For the foregoing reasons, I recommend that the Court **grant** Defendants' motion for summary judgment (ECF No. 35) and dismiss Plaintiff's complaint **with prejudice**.

Dated: January 4, 2021                                                                   /s/ Sally J. Berens
                                                                                                     SALLY J. BERENS
                                                                                                     U.S. Magistrate Judge

## NOTICE

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).